**United States District Court**
**District of Massachusetts**

```
_____   )
                              )
HOPKINTON FRIENDLY SERVICE,   )
INC.,                         )
                              )
         Plaintiff,           )
                              )     Civil Action No.
         v.                   )     18-11977-NMG
                              )
GLOBAL COMPANIES LLC, and GLOBAL )
MONTELLO GROUP CORP.,         )
                              )
         Defendants.          )
_____   )
```

**MEMORANDUM & ORDER**

**GORTON, J.**

Hopkinton Friendly Service, Inc. ("Hopkinton" or "plaintiff") filed a complaint against Global Companies LLC and Global Montello Group (collectively "Global" or "defendants") alleging violations of the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801, <u>et</u> <u>seq.</u>, and various state law claims, including a claim for unfair and deceptive practices pursuant to M.G.L. c. 93A.  Plaintiff seeks injunctive and declaratory relief, as well as damages including costs, interest and attorneys' fees.  That action stems from a dramatic increase in Hopkinton's monthly rent that allegedly violates federal and state law.

On September 20, 2018, Hopkinton filed a motion for a preliminary injunction enjoining Global from increasing the rent

-1-

and terminating plaintiff's commercial lease and franchise pending completion of this litigation.  For the reasons that follow, the motion for a preliminary injunction will be denied.

I.   **Background and Procedural History**

   **A. Facts**

Hopkinton is a small family operated business that has leased a gas station at 92 West Main Street in Hopkinton, Massachusetts ("the Premises"), for the last 40 years.  For the first 30 of those years, plaintiff leased the Premises from ExxonMobile Oil Corporation ("ExxonMobile").  From approximately September, 2010, to the present, plaintiff has leased the Premises from defendants.  Defendants distribute and sell gasoline and other petroleum products through a franchise system.  At the time ExxonMobile transferred the Premises to defendants, plaintiff entered into a PMPA franchise agreement with defendants.  The original franchise agreement was initially for three years and required plaintiff to pay a monthly rent for the Premises of $8,730 with scheduled annual increases. Plaintiff entered into its first extension of the PMPA franchise agreement in 2015 which covered an additional three years at an increased monthly rental payment of $11,450.

In October, 2017, Stephen Lundgren, Vice President of Global, advised Nayla Aoude, a representative of Hopkinton, that Global was considering an expansion and redevelopment of the

-2-

Premises, including the purchase of two parcels adjacent to the Premises to accommodate a larger layout and larger convenience store for the site.  In December, 2017, plaintiff received from defendants a franchise renewal agreement for an additional three years at a monthly rental payment of $14,138 with a scheduled increase for each subsequent year based on Rent Guidelines which were enclosed.  The Rent Guidelines were expressly incorporated into the franchise renewal agreement and are the same guidelines that apply to all other franchisees of the defendants. Plaintiff was given until March 22, 2018, to accept or reject the offered renewal agreement.

On January 30, 2018, defendants notified plaintiff in writing of its redevelopment plans for the Premises.  Defendants explained that if they chose to proceed with the redevelopment, they would acquire property adjacent to the Premises, construct a larger store, add additional dispensers and improve the layout of the Premises to provide additional parking and more efficient customer traffic flow.  The notice referred plaintiff to the applicable portion of the Rent Guidelines which indicated that there would be an associated rental increase based upon the total capital expenditure of the project.  The letter 1) estimated renovation costs to be greater than $500,000 with an associated annual rent increase of 15% of the total renovation costs based on the Rent Guidelines, 2) stated that defendants

were not obligated to proceed with the redevelopment and 3) reminded plaintiff that it had a right under the lease to terminate the franchise agreement within 30 days of being notified of any rent increase.

Plaintiff signed the franchise renewal agreement ("the Agreement") on March 16, 2018, to become effective on July 1, 2018, for a period of three years.  In June, 2018, the Town of Hopkinton Planning Board approved the permits for the redevelopment project and acquisition of the property needed for the redevelopment was completed in September, 2018.

On August 21, 2018, defendants delivered a letter to plaintiff confirming the redevelopment of the Premises to begin in Fall of 2018.  That letter also informed plaintiff for the first time that the total cost of redevelopment would be in excess of $5 million, resulting in a monthly rental more than five times greater than what was contained in the Agreement, i.e. $79,301 per month commencing upon completion of the redevelopment.  The letter explained that plaintiff would have to pay for the interior layouts, equipment and products for the larger store (which, according to plaintiff's Certified Public Accountant ("CPA"), could exceed $120,000) in addition to the increased rent.  The letter also reminded plaintiff of its right to terminate the Agreement within 30 days of receipt of notice of the rent increase or else be obligated to continue the

-4-

franchise relationship subject to that increase.  Plaintiff did
not submit a notice of termination before September 20, 2018,
and continues to operate the franchise on the Premises.

Plaintiff alleges that from 2012 to 2017, it has never made
an annual net profit of more than $70,000 and thus is unable to
afford the dramatically increased monthly rental.  Plaintiff's
CPA estimates that Hopkinton would have to sell an additional
$6.4 million in product and double the rest of its revenue to
cover the increased rent which is highly unlikely despite the
prospective renovations.

**B. Alleged Violations**

Plaintiff contends that the sudden and drastic increase in
rent constitutes a constructive termination of plaintiff's
franchise agreement in violation of the PMPA.  The PMPA provides
that

> no franchisor engaged in the sale, consignment, or
> distribution of motor fuel in commerce may-- (1) terminate
> any franchise . . . prior to the conclusion of the term, or
> the expiration date, stated in the franchise; or (2) fail
> to renew any franchise relationship . . . .

§ 2802(a).

Plaintiff argues that by undertaking a unilateral
redevelopment of the Premises which will result in an inordinate
increase in the monthly rent for plaintiff, Global's purpose was
to coerce Hopkinton into terminating its lease and franchise in
violation of Hopkinton's protected rights.  Plaintiffs contend

-5-

that this constituted a constructive termination because
plaintiffs were left with the Hobson's choice of terminating the
Agreement or perpetuating an unworkable franchise.  Plaintiff
asserts that defendants knew the premises could not generate
sufficient revenue to cover the increased rent and thus did not
negotiate the renewal in good faith.

### C. Procedural History

On September 20, 2018, plaintiff filed motions for both a
temporary restraining order and a preliminary injunction under
§ 2805(b) of the PMPA.  The Court denied plaintiff's motion for
a temporary restraining order the following day (Docket No. 11),
and directed plaintiff to give requisite notice to defendants of
a hearing on plaintiff's motion for a preliminary injunction
which is now before the Court.

## II.  Plaintiff's Motion for a Preliminary Injunction

### A.   Legal Standard Under § 2805(b) of the PMPA

The PMPA promulgates a separate standard for granting
preliminary injunctive relief that is more forgiving than the
common law standard. Esso Standard Oil Co. (P.R.) v. Monroig-
Zayas, 445 F.3d 13, 17 (1st Cir. 2006).  That relaxed standard
provides that

> the court shall grant a preliminary injunction if-- (A) the
> franchisee shows-- (i) the franchise of which he is a party
> has been terminated or the franchise relationship of which
> he is a party has not been renewed, and (ii) there exist
> sufficiently serious questions going to the merits to make

-6-

> such questions a fair ground for litigation; and (B) the
> court determines that, on balance, the hardships imposed
> upon the franchisor by the issuance of such preliminary
> injunctive relief will be less than the hardship which
> would be imposed upon such franchisee if such preliminary
> injunctive relief were not granted.

§ 2805(b).

In <u>Mac's Shell Service, Inc.</u> v. <u>Shell Oil Products Co. LLC</u>, 559 U.S. 175, 182 (2010), the Supreme Court held that a franchisee can maintain a constructive termination claim under the PMPA only if the franchisor's conduct forced the franchisee to end its franchise agreement.

> [A] franchisee who continues operating a franchise—
> occupying the same premises, receiving the same fuel, and
> using the same trademark—has not had the franchise
> terminated in either the ordinary or technical sense of the
> word.

<u>Id.</u> at 183-84, 190 (internal quotation marks omitted) (holding that abandonment of any of the three statutory elements of the franchise operation—use of the franchisor's trademark, purchase of the franchisor's fuel or occupation of the franchisor's service station—was a necessary element of any constructive termination claim under the PMPA).  The Court reasoned that

> [r]equiring franchisees to abandon their franchises before
> claiming constructive termination is also consistent with
> the general understanding of the doctrine of constructive
> termination [in other contexts].

<u>Id.</u> at 184.

In so holding, the Court rejected the argument that its reading of the word "terminate" would render the PMPA's

-7-

preliminary injunction provision meaningless by requiring
franchisees to go out of business before they can obtain
injunctive relief. Id. at 188.  The Court stated that in cases
of actual termination where the franchisee receives a written
notice of termination in advance of the date thereof, the
franchisee may invoke the protections of the PMPA's preliminary
injunction mechanism. Id. at 189.  In discussing the PMPA's
preliminary injunction provision, the Court noted that the
government, as amicus curiae, advocated that the Act permits a
franchisee to seek preliminary injunctive relief if a franchisor
announces

> its intent to engage in conduct that would leave the
> franchisee no reasonable alternative but to abandon one (or
> more) of the franchise elements.

Id. at 189 n.9 (internal quotation marks omitted) (quoting Brief
for United States as Amicus Curiae at 21, Mac's Shell Serv.,
Inc. v. Shell Oil Prods. Co. LLC, 559 U.S. 175 (2010) (Nos. 08-
240 & 08-372)).  The Court did not, however, decide that issue
and it does not appear that any Circuit Court of Appeals (or any
other court) has adopted the position taken by the government in
its amicus brief that a franchise agreement can be
constructively terminated without the franchisee actually
abandoning it.  The Court reasoned that even though the PMPA
fails to provide protection from certain unfair or coercive

franchisor conduct, franchisees still have state-law remedies available to them. Id. at 187-88.

The Supreme Court left open, however, the direct issue of whether the PMPA addresses claims for constructive termination at all but noted that several Courts of Appeals have held that the statute does create a cause of action for constructive termination. Mac's Shell Serv., 559 U.S. at 182 n.4 (citing Marcoux v. Shell Oil Prods. Co. LLC, 524 F.3d 33, 44-45 (1st Cir. 2008); Clark v. BP Oil Co., 137 F.3d 386, 390-91 (6th Cir. 1998); Shukla v. BP Expl. & Oil, Inc., 115 F.3d 849, 852-53 (11th Cir. 1997)). Two other Circuits have reserved judgment on that issue. See Abrams Shell v. Shell Oil Co., 343 F.3d 482, 486-88 (5th Cir. 2003); Portland 76 Auto/Truck Plaza, Inc. v. Union Oil Co. of Cal., 153 F.3d 938, 948 (9th Cir. 1998). Those circuit courts have required the franchisee to show that the franchisor's conduct either breached the franchise agreement or violated state law. See Portland 76 Auto/Truck Plaza, 153 F.3d at 948; Shukla, 115 F.3d at 853; Chestnut Hill Gulf, Inc. v. Cumberland Farms, Inc., 940 F.2d 744, 750-51 (1st Cir. 1991); May-Som Gulf, Inc. v. Chevron U.S.A., Inc., 869 F.2d 917, 922 (6th Cir. 1989).

Finally, the Court in Mac's Shell Service held that there can be no claim for constructive nonrenewal of the franchise

agreement where the franchisee agrees to accept a renewal

agreement. Id. at 191.  The Court found that

> the [PMPA] prohibits only unlawful fail[ures] to renew a
> franchise relationship, not renewals of a franchise
> relationship on terms that are less than favorable to the
> franchisee.  A franchisee that signs a renewal agreement,
> in short, cannot carry the threshold burden of showing a
> nonrenewal of the franchise relationship . . . and thus
> necessarily cannot establish that the franchisor has
> violated the Act.

Id. at 191-92 (alteration in original) (internal quotation marks

omitted).

## B.   Application of PMPA Standard

Plaintiff has not demonstrated that it has actually

abandoned any aspect of its franchise.  In fact, plaintiff

brings this action precisely for the purpose of enjoining Global

from coercing it into terminating the franchise agreement.

Plaintiff continues to operate the convenience store and service

station on the Premises, receive fuel from defendants and use

the franchisor's trademark.  Without abandoning at least one of

those statutory elements of the franchise, there can be no claim

for constructive termination under the PMPA.  While defendants'

conduct in quintupling the monthly rental arguably leaves

plaintiff no reasonable alternative but to abandon the franchise

because it will necessarily default, no court has held that such

conduct constitutes constructive termination.  Because plaintiff

has taken no steps to terminate the franchise, it has no claim for relief under the PMPA.

Even if plaintiff could show that it had abandoned some aspect of the franchise, it would likely still be unable to maintain a claim for injunctive relief.  Defendants have not breached any provision of the Agreement in pursuing the redevelopment project and raising the rent, nor has their conduct, for reasons explained below, violated any provision of Massachusetts state law. See Chestnut Hill Gulf, 940 F.2d at 750-51 (explaining that the general rule applied by courts is that a claim for constructive termination under the PMPA requires either a breach of the franchise agreement or a violation of state law).

Finally, plaintiff is precluded from maintaining a claim for constructive nonrenewal under the PMPA.  Hopkinton actually accepted and signed the Agreement and thus cannot carry its threshold burden of showing a nonrenewal of the franchise relationship.  For these reasons, plaintiff cannot avail itself of the injunctive relief provision of the PMPA and its motion for a preliminary injunction will therefore be denied.

### C.   Legal Standard Under the Common Law

Where the relaxed preliminary injunction standard of the PMPA does not apply, courts may still apply the common law standard to alleged violations of the PMPA. See Esso Standard,

-11-

445 F.3d at 17-18.   In order to obtain a preliminary injunction, the moving party must establish 1) a reasonable likelihood of success on the merits, 2) the potential for irreparable harm if the injunction is withheld, 3) a favorable balance of hardships and 4) the effect on the public interest. Jean v. Mass. State Police, 492 F.3d 24, 26-27 (1st Cir. 2007).   Out of these factors, the likelihood of success on the merits "normally weighs heaviest in the decisional scales." Coquico, Inc. v. Rodriguez-Miranda, 562 F.3d 62, 66 (1st Cir. 2009).

The Court may accept as true "well-pleaded allegations [in the complaint] and uncontroverted affidavits." Rohm & Haas Elec. Materials, LLC v. Elec. Circuits, 759 F. Supp. 2d 110, 114, n.2 (D. Mass. 2010) (quoting Elrod v. Burns, 427 U.S. 347, 350, n.1 (1976)).   The Court may also rely on otherwise inadmissible evidence, including hearsay, in deciding a motion for preliminary injunction. See Asseo v. Pan Am. Grain Co., Inc., 805 F.2d 23, 26 (1st Cir. 1986).   Ultimately, the issuance of preliminary injunctive relief is "an extraordinary and drastic remedy that is never awarded as of right." Peoples Fed. Sav. Bank v. People's United Bank, 672 F.3d 1, 8-9 (1st Cir. 2012) (quoting Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011)).

### D.   Application of Common Law Standard

#### 1. Likelihood of Success

##### i. PMPA Claim

For the same reason that plaintiff cannot demonstrate a right to preliminary injunctive relief under the PMPA standard, i.e. its failure to terminate the franchise, plaintiff also fails to establish the first prong for injunctive relief under the common law standard.  Without showing that it has actually abandoned the franchise as a result of defendants' conduct, plaintiff cannot show that it has a reasonable likelihood of success on the merits of its PMPA claim. See Mac's Shell Serv., at 183-84, 190.  Plaintiff's motion for a preliminary injunction under the PMPA is unavailing.

##### ii. State Law Claims

Plaintiff submits that even if the Court finds that a preliminary injunction on the basis of its PMPA claim is unwarranted, the Court should still allow its motion for a preliminary injunction on the basis of its state law claims. Those include claims for breach of contract and for unfair or deceptive practices pursuant to M.G.L. c. 93A.

When determining whether an act or practice is unfair for purposes of Chapter 93A, a court assesses

> (1) whether the practice . . . is within at least the
> penumbra of some common-law, statutory, or other
> established concept of unfairness; (2) whether it is

> immoral, unethical, oppressive, or unscrupulous; [and] (3)
> whether it causes substantial injury to consumers (or
> competitors or other business[people]).

City of Beverly v. Bass River Golf Mgmt., Inc., 93 N.E.3d 852,

863 (Mass. App. Ct. 2018) (alterations in original).

> Practices may be deemed deceptive where they could
> reasonably be found to have caused a person to act
> differently from the way he otherwise would have
> acted . . . [or] when [the conduct] tends to mislead.

Id. (internal quotation marks omitted).

> [A] mere breach of contract, without more, does not amount
> to a violation of G.L. c. 93A . . . [but rather] [c]ourts
> must consider whether the nature, purpose, and effect of
> the challenged conduct is coercive or extortionate.

Id. (internal quotation marks omitted); see also Skehel v.

DePaulis, No. 13-cv-11202-ADB, 2017 WL 2380164, *3 (D. Mass.

June 1, 2017) ("To be actionable, the challenged misconduct must

rise to the level of an extreme or egregious business wrong,

commercial extortion, or similar level of rascality that raises

an eyebrow of someone inured to the rough and tumble of the

world of commerce." (internal quotation marks omitted)); Levings

v. Forbes & Wallace, Inc., 396 N.E.2d 149, 153 (Mass. App. Ct.

1979) (Kass, J.).

    Plaintiff contends that defendants' conduct in pursuing the

redevelopment project and increasing the rent five-fold is

unfair and deceptive because defendants knew that Hopkinton

could not afford such an exhorbitant increase in rent.  While

not entirely clear from plaintiff's pleadings, its argument

appears to be that defendants' representation in the January letter that the redevelopment was likely to cost more than $500,000 was misleading and deceptive because it is now informed that the costs of redevelopment will exceed $5 million.  If it had known of the quintupling of its rent, it would not have signed the franchise renewal agreement.  Plaintiff provides no case law, however, that directly supports its proposition that defendants' conduct constituted unfair or deceptive trade practices under Chapter 93A.

Defendants respond that the PMPA preempts plaintiff's Chapter 93A claim.  Defendants rely for that proposition upon two District of Massachusetts cases and a First Circuit case, all decided before Mac's Shell Service. See Esso Standard Oil Co. v. Dep't of Consumer Affairs, 793 F.2d 431 (1986); Townsend v. Mobil Oil Corp., No. 91-cv-30048-F, 1992 WL 17252, at *7 (D. Mass. Jan. 28, 1992) (holding that franchisee's c. 93A claim based on franchisor's alleged unfair acts in entering into new franchise agreement with third party in conjunction with termination of plaintiff's franchise is preempted by PMPA); Smoot v. Mobil Oil Corp., 722 F. Supp. 849, 859 (D. Mass. 1989) ("In the PMPA, Congress expressly set out the preemptive scope of that legislation: it stated that no state or local entity could adopt any provision regarding the termination or non-renewal of the franchise. . . . Thus . . . the only grounds on

-15-

which a franchisee can contest the termination or non-renewal of a franchise would be those set out by the PMPA." (internal quotation marks omitted)).

The holdings of <u>Smoot</u> and <u>Townsend</u> and defendant's claim for broad preemption by the PMPA appear inconsistent, however, with the Supreme Court's statement in <u>Mac's Shell Service</u> that

> [t]he pre-emptive scope of the PMPA is limited: The Act
> pre-empts only those state or local laws that govern the
> termination of petroleum franchises or the nonrenewal of
> petroleum franchise relationships. . . . Outside of those
> areas, therefore, franchisees can still rely on state-law
> remedies to address wrongful franchisor conduct that does
> not have the effect of ending the franchise.

<u>Mac's Shell Serv.</u>, 559 U.S. at 187.  Furthermore, the First Circuit in <u>Esso Standard Oil Co.</u> held

> [b]y specifying with such precision when the states must
> stand aside in favor of federal regulation, Congress
> implicitly marked out the bounds of the power in intended
> to exercise.  Beyond those limits, state regulation may
> claim full federal approbation.  Thus, through its express
> preemption provision, Congress indicated that it did not
> intend to preempt all state provisions involving the
> substantive aspects of petroleum-products franchises.

<u>Esso Standard Oil Co.</u>, 793 F.2d at 434 (citations omitted) (internal quotation marks omitted).  Concluding that the PMPA would clearly preempt any state regulation that attempted to govern terminations or nonrenewals, the First Circuit held that the state rent regulation at issue governed a substantive element of the franchise agreement and was thus not preempted by the PMPA. <u>See</u> <u>id.</u> at 435 ("We cannot bring ourselves to believe

that the PMPA was intended <u>sub</u> <u>rosa</u> to invalidate all state
legislation impacting on franchisors.  State regulation that may
affect the profitability of a non-terminated franchise, but does
not preclude the franchisor's ability to terminate the franchise
relationship, is outside the sphere Congress sought to occupy in
enacting the PMPA.").

Based on that language from <u>Mac's Shell Service</u> and <u>Esso</u>
<u>Standard Oil Co.</u>, plaintiff has a colorable argument that its
Chapter 93A claim is not preempted by the PMPA.  The Court
construes plaintiff's claim for unfair or deceptive practices
not as an attempt to thwart defendants' ability to terminate or
refuse to renew the franchise agreement, but rather as an effort
to promote transparency in the franchise renewal process,
especially with respect to rental increases.

Even assuming that plaintiff's Chapter 93A claim is not
preempted by the PMPA because it deals with a substantive aspect
of the franchise agreement, defendants nevertheless claim that
plaintiff cannot demonstrate a reasonable likelihood of success
on the merits of its Chapter 93A claim.  Defendants assert that
their conduct did not violate Chapter 93A for two reasons: (1)
they have not breached the terms of the franchise renewal
agreement because the agreement expressly allows them to
redevelop the Premises at any time and to increase the rent to
cover the costs of such redevelopment and (2) the substantial

-17-

rent increase is permissible under the PMPA because it was promulgated in good faith and in the normal course of business.

Plaintiff responds that defendants pursued the redevelopment and unconscionably increased its rent for the sole purpose of coercing Hopkinton either to terminate the Agreement or to default.  Plaintiff has not alleged a single, non-conclusory fact, however, demonstrating that the redevelopment or rent increase was done in bad faith, let alone that it was misconduct rising to the level of an extreme or egregious business wrong or commercial extortion.  Indeed, defendants have complied with the literal terms of the franchise renewal agreement which permitted both the redevelopment project and the correspondent rental increase the latter of which was imposed pursuant to defendants' uniform Rent Guidelines that apply to all of their franchisees.  Moreover, plaintiff was aware that a $500,000 redevelopment project was in the offing when it entered into the renewal of its Agreement with defendants.

Plaintiff has cited no case law supporting its proposition that the redevelopment project or rental increase was unfair or deceptive under Chapter 93A or that it constituted a breach of contract and thus has failed to satisfy its burden as the moving party. See Esso Standard, 445 F.3d at 18 ("The party seeking the preliminary injunction bears the burden of establishing that the[] [preliminary injunction] factors weigh in its favor.").

-18-

For those reasons, plaintiff's motion for a preliminary
injunction on the basis of its state law claims will be denied.

### 2. Potential for Irreparable Harm

While the likelihood of the success on the merits provides
the "touchstone of the preliminary injunction inquiry," the
second element for consideration, namely irreparable harm, in
this case also weighs against plaintiff. Philip Morris, Inc. v.
Harshbarger, 159 F.3d 670, 674 (1st Cir. 1998).  To obtain
preliminary injunctive relief, plaintiff must demonstrate that
it will suffer irreparable harm that is real and not purely
theoretical. Matos ex rel. Matos v. Clinton Sch. Dist., 367 F.3d
68, 73 (1st Cir. 2004).

Plaintiff submits that it will be subject to irreparable
harm if it is forced either to terminate the lease or default
because of the exhorbitant monthly rent.  Either way it will
purportedly lose its steadfast family-owned business.  The
increased monthly rent is not set to take effect, however, until
the completion of the redevelopment project.  That project could
presumably take several years to complete and thus plaintiff is
in no immediate danger of defaulting under its increased rental
obligations.  Moreover, neither the parties nor the Court can
predict the profitability of the enterprise after the
redevelopment.  At this point, plaintiff's purported harm
resulting from the increased rent is speculative and thus

injunctive relief is unwarranted. <u>See</u> <u>Coriatt-Gaubil</u> v. <u>Roche</u> <u>Bobois Int'l, S.A.</u>, 717 F. Supp. 2d 132, 138 (D. Mass. 2010).

**ORDER**

For the forgoing reasons, plaintiff's motion for a preliminary injunction (Docket No. 7) is **DENIED**.


**So ordered.**

                              _/s/ Nathaniel M. Gorton_____
                              Nathaniel M. Gorton
                              United States District Judge
Dated October 22, 2018