## United States District Court
## District of Massachusetts

———————————————————— )
HOPKINTON FRIENDLY SERVICE,  )
INC.,                        )
                             )
        Plaintiff,           )
                             )
        v.                   )      Civil Action No.
                             )      18-11977-NMG
GLOBAL COMPANIES LLC and GLOBAL )
MONTELLO GROUP CORP.,        )
                             )
        Defendants.          )
———————————————————— )

### MEMORANDUM & ORDER

**GORTON, J.**

Hopkinton Friendly Service, Inc. ("Hopkinton" or "plaintiff") filed a complaint against Global Companies LLC and Global Montello Group (collectively "Global" or "defendants") alleging violations of the Petroleum Marketing Practices Act ("the PMPA"), 15 U.S.C. § 2801, et seq., and various state law claims, including claims for breach of contract and unfair and deceptive practices pursuant to M.G.L. c. 93A. Plaintiff seeks injunctive and declaratory relief, as well as damages.

Hopkinton alleges that Global violated its rights under federal and state law when it dramatically increased its monthly rent pursuant to a massive redevelopment project at the subject gas station. Before the Court is Global's motion to dismiss the

complaint.  For the reasons that follow, the motion will be
allowed, in part, and denied, in part.

I.   **Background**

    **A.   Facts**

Hopkinton is a small, family-operated business that has
leased a gas station at 92 West Main Street in Hopkinton,
Massachusetts ("the Premises"), from defendants and their
predecessor for the past 40 years.  For the first 30 of those
years, plaintiff leased the Premises from ExxonMobil Oil
Corporation ("ExxonMobil") but since approximately September,
2010, the lessor of the Premises has been Global.  Global
distributes and sells gasoline and other petroleum products
through a franchise system.  After ExxonMobil sold the Premises
to defendants, plaintiff entered into a PMPA franchise agreement
with defendants.

The original franchise agreement was for three years and
required plaintiff to pay a monthly rental of $8,730 with
scheduled annual increases.  Hopkinton entered into its first
extension of the PMPA franchise agreement in 2015 which covered
an additional three years at an increased monthly rental payment
of $11,450 subject to scheduled increases for each subsequent
year.  During that time, Hopkinton allegedly earned a monthly
profit of between $15,000 and $20,000.

Hopkinton alleges that in or around January, 2017, Global retained attorneys, consultants and engineers to redevelop the Premises.  In or around June, 2017, Global (through a wholly-owned subsidiary) purportedly began purchasing or entering into agreements to purchase properties abutting the Premises to be used for the reconstruction of the existing gas station and convenience store.  Global allegedly did not notify plaintiff of their purchase of the abutting properties or of their intent to drastically expand their operations at the Premises.

In December, 2017, Hopkinton received from Global a franchise renewal agreement for an additional three years at a monthly rental payment of $14,138 subject to scheduled increases for each subsequent year based on Rent Guidelines which were enclosed.  The Rent Guidelines are expressly incorporated into the franchise renewal agreement and are said to be the same guidelines that apply to all other franchisees of the defendants.  The renewal agreement also provides Global the discretionary right to redevelop the Premises at any time and to increase the rent based upon the cost of the redevelopment but did not disclose defendants' planned capital investment at that time.  The renewal agreement also provides that during the period of demolition/construction, Global will reduce plaintiff's gasoline purchase requirements and rent by an amount

that, in its judgment, would adequately compensate plaintiff for the restrictions in use of the Premises.

The renewal agreement gives Hopkinton the right to terminate the franchise agreement within 30 days of receiving notice of a rent increase but plaintiff asserts that the agreement also requires it to pay to Global 1) all expenses incurred by Global as a result of that termination, 2) any rent and other charges owed to Global up to the time of termination and 3) an amount equal to the rent and other charges and expenses that would be payable if the lease remains in effect, less the net proceeds from Global's reletting of the Premises. Plaintiff was given until March 22, 2018, to accept or reject the proffered renewal agreement.

On January 3, 2018, Global submitted an application with the Town of Hopkinton for special permits and variances for the construction of the new gas station and convenience store.  That application was accompanied by site development plans and reports prepared by various engineering companies.

On January 30, 2018, defendants notified plaintiff in writing of its plans for redevelopment of the Premises ("the January Letter").  Defendants explained that if they chose to proceed with the redevelopment, they would acquire property adjacent to the Premises, construct a larger store, add additional dispensers and improve the layout of the Premises to

provide additional parking and more efficient customer traffic flow.

The notice referred plaintiff to the applicable portion of the Rent Guidelines which indicated that there would be an associated rental increase based upon the total capital expenditure of the project.  The letter included: 1) estimated renovation costs at greater than $500,000 with an associated rent increase of 15% based on the Rent Guidelines, 2) a disclaimer of defendants' obligation to proceed with the redevelopment and 3) a reminder that plaintiff had a right under the lease to terminate the franchise agreement within 30 days of being notified of any rent increase.  The letter did not, however, disclose that Global had already submitted an application with the Town of Hopkinton for special permits and variances to allow for the construction of the new gas station and convenience store or that consultants had prepared plans and reports for the redevelopment project.

Plaintiff signed the franchise renewal agreement ("the Agreement") on March 16, 2018, to become effective on July 1, 2018, for a period of three years.  In or around June, 2018, the Town of Hopkinton Planning Board approved the special permits for the redevelopment project.  The acquisition of the property needed for the redevelopment was completed in September, 2018.

On August 21, 2018, Global delivered a letter to Hopkinton confirming the redevelopment of the Premises and notifying it that construction would begin in Fall of 2018.  That letter also informed Hopkinton for the first time that the total cost of redevelopment would be in excess of $5 million, resulting in a monthly rental of more than five times the amount anticipated in the Agreement, i.e. $79,301 per month, commencing upon completion of the redevelopment.  The letter explained that Hopkinton would have to pay for the interior layouts, equipment and products for the larger store and those costs, according to plaintiff's Certified Public Accountant ("CPA"), could exceed $120,000 in addition to the increased rent.  The letter also reminded Hopkinton of its right to terminate the Agreement within 30 days of receipt of notice of the rental increase or else be obligated to continue the franchise relationship subject to that increase.  Hopkinton did not submit a notice of termination before September 20, 2018, and continues to operate the franchise on the Premises.

Plaintiff alleges that from 2012 to 2017, it has never made an annual net profit of more than $70,000 and thus is unable to afford the dramatically increased monthly rental under the Agreement.  Plaintiff's CPA estimates that Hopkinton would have to nearly double its current revenue and sell an additional $6.4

million in product to cover the increased rent which he believes is unlikely despite the larger store after redevelopment.

**B.   Alleged Violations**

Hopkinton contends that the sudden dramatic increase in rent constitutes a constructive termination of its franchise agreement in violation of the PMPA.  It argues that by undertaking a unilateral redevelopment of the Premises which will result in a dramatically increased monthly rent for plaintiff, Global's purpose was to coerce Hopkinton into terminating its lease and franchise in order to misappropriate its goodwill without payment.  Plaintiff contends that actions of defendants constitute a constructive termination because Hopkinton was left with the choice of either terminating or defaulting under the Agreement as a result of the increased rent.  Plaintiff submits that defendants knew that the Premises did not generate sufficient revenue to cover the increased rent and thus did not negotiate the Agreement in good faith.

Hopkinton brings claims for 1) violations of the PMPA and injunctive relief thereunder, 2) breach of contract, 3) breach of the implied covenant of good faith and fair dealing, 4) unfair and deceptive practices under M.G.L. c. 93A, and 5) fraud in the inducement.

### C.    Procedural History

On September 20, 2018, Hopkinton filed motions for both a temporary restraining order and a preliminary injunction under § 2805(b) of the PMPA.  The Court denied plaintiff's motion for a temporary restraining order the following day.  On October, 22, 2018, the Court denied the motion for a preliminary injunction after a hearing.  In December, 2018, plaintiff filed an amended complaint in response to which Global filed a timely motion to dismiss for failure to state a claim.

## II.  Motion to Dismiss

### A.    Legal Standard

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  In considering the merits of a motion to dismiss, the Court may look only to the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the complaint and matters of which judicial notice can be taken. Nollet v. Justices of Trial Court of Mass., 83 F. Supp. 2d 204, 208 (D. Mass. 2000), aff'd, 248 F.3d 1127 (1st Cir. 2000).  Furthermore, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. Langadinos v. Am. Airlines, Inc., 199 F.3d 68, 69 (1st Cir. 2000).  Although a

court must accept as true all of the factual allegations
contained in a complaint, that doctrine is not applicable to
legal conclusions. Ashcroft v. Iqbal, 556 U.S. 662 (2009).

**B.   Application**

**1.   Counts I & II: The PMPA Claims**

The PMPA generally provides that

> no franchisor engaged in the sale, consignment, or
> distribution of motor fuel in commerce may-- (1)
> terminate any franchise . . . prior to the conclusion
> of the term, or the expiration date, stated in the
> franchise; or (2) fail to renew any franchise
> relationship . . . .

15 U.S.C. § 2802(a).  It also permits an aggrieved franchisee to
maintain a civil action (both for damages and for injunctive
relief) against a franchisor that violates the franchisee's
rights under the statute. 15 U.S.C. § 2805(a)-(d).

In Mac's Shell Service, Inc. v. Shell Oil Products Co. LLC,
559 U.S. 175, 182 (2010), the Supreme Court held that, even
assuming a claim for constructive termination exists under the
PMPA, such a claim can be maintained only if the franchisor's
conduct forced the franchisee to end its franchise agreement.

> [A] franchisee who continues operating a franchise—
> occupying the same premises, receiving the same fuel,
> and using the same trademark—has not had the franchise
> terminated in either the ordinary or technical sense
> of the word.

Id. at 183-84, 190 (internal quotation marks omitted) (holding
that abandonment of any of the three statutory elements of the

franchise operation—1) use of the franchisor's trademark, 2) purchase of the franchisor's fuel or 3) occupation of the franchisor's service station—was a necessary element of any constructive termination claim under the PMPA).  The Court reasoned that

> [r]equiring franchisees to abandon their franchises before claiming constructive termination is also consistent with the general understanding of the doctrine of constructive termination [in other contexts].

Id. at 184.

In so holding, the Court rejected the argument that its reading of the word "terminate" would render the PMPA's preliminary injunction provision meaningless by requiring franchisees to go out of business before they can obtain injunctive relief. Id. at 188.  The Court stated that in cases of actual termination where the franchisee receives a written notice of termination in advance of the date thereof, the franchisee may invoke the protections of the PMPA's preliminary injunction mechanism. Id. at 189.  In discussing the PMPA's preliminary injunction provision, the Court noted that the government, as amicus curiae, advocated that the Act permits a franchisee to seek preliminary injunctive relief if a franchisor announces

> its intent to engage in conduct that would leave the franchisee no reasonable alternative but to abandon one (or more) of the franchise elements.

Id. at 189 n.9 (internal quotation marks omitted) (quoting Brief
for United States as Amicus Curiae at 21, Mac's Shell Serv.,
Inc. v. Shell Oil Prods. Co. LLC, 559 U.S. 175 (2010) (Nos. 08-
240 & 08-372)).

The Court did not, however, decide that issue and it does
not appear that any Circuit Court of Appeals (or any other
court) has adopted the position taken by the government in its
amicus brief that a franchise agreement can be constructively
terminated without the franchisee actually abandoning it.  The
Court reasoned that even though the PMPA fails to provide
protection from certain unfair or coercive franchisor conduct,
franchisees still have state-law remedies available to them. Id.
at 187-88.

Finally, the Court in Mac's Shell Service held that there
can be no claim for constructive non-renewal of the franchise
agreement where the franchisee agrees to accept a renewal
agreement. Id. at 191.  The Court found that

> the [PMPA] prohibits only unlawful fail[ures] to renew
> a franchise relationship, not renewals of a franchise
> relationship on terms that are less than favorable to
> the franchisee.  A franchisee that signs a renewal
> agreement, in short, cannot carry the threshold burden
> of showing a nonrenewal of the franchise
> relationship . . . and thus necessarily cannot
> establish that the franchisor has violated the Act.

Id. at 191-92 (alteration in original) (internal quotation marks
omitted).

Hopkinton has not demonstrated that it has actually abandoned any aspect of its franchise.  In fact, it brings this action, in part, to enjoin Global from coercing it into terminating the franchise agreement.  Plaintiff continues to operate the convenience store and service station on the Premises, receive fuel from defendants and use the franchisor's trademark.  Without abandoning at least one of those statutory elements of the franchise, there can be no claim for constructive termination under the PMPA.  While defendants' conduct in dramatically increasing the monthly rent arguably leaves plaintiff no reasonable alternative but to abandon the franchise, no court has held that such conduct constitutes constructive termination.  Because Hopkinton has taken no steps to terminate the franchise, it has no claim for relief under the PMPA.

Moreover, the letter notifying plaintiff of the dramatic rent increase was not the equivalent of a notice of termination that would permit it to invoke the protections of the PMPA. That letter did not communicate Global's intent to terminate the franchise relationship with Hopkinton but rather notified it of the exercise of Global's contractual right to pursue redevelopment and a corresponding rent increase. See 15 U.S.C. § 2804(c)(3)(A).

Nor has plaintiff demonstrated a claim for constructive non-renewal under the PMPA.  It actually accepted and signed the Agreement and thus cannot carry its threshold burden of showing a non-renewal of the franchise relationship.  Accordingly, defendants' motion to dismiss the PMPA claims (Counts I and II) will be allowed.

### 2.   Count III: Breach of Contract

Under Massachusetts law, to prove a breach of contract the plaintiff must demonstrate that: 1) "there was an agreement between the parties"; 2) "the agreement was supported by consideration"; 3) "the plaintiff was ready, willing, and able to perform his or her part of the contract"; 4) "the defendant committed a breach of the contract"; and 5) "the plaintiff suffered harm as a result". Bulwer v. Mount Auburn Hosp., 46 N.E.3d 24, 39 (Mass. 2016).

Hopkinton has not shown which provision of the Agreement Global actually breached.  Rather, it submits that defendants violated the contract by using their discretionary right to redevelop the Premises as a pretext to coerce it into terminating the Agreement.  Even if Global did exercise its right to redevelop the Premises in bad faith, that allegation does not alone constitute a breach of contract. See Uno Rests., Inc. v. Bos. Kenmore Realty Corp., 805 N.E.2d 957, 964 (Mass. 2004) (explaining that the implied covenant of good faith and

-13-

fair dealing cannot be used to create new rights and duties that are not otherwise provided for in the contract).

Defendants have complied with the literal terms of the franchise renewal agreement which permits both the redevelopment project and an associated rental increase and the latter has been imposed pursuant to uniform Rent Guidelines that apply to all of defendants' franchisees.  Plaintiff was also aware that a redevelopment project costing more than $500,000 was probable when it entered into the renewal of its Agreement with defendants.  Furthermore, Hopkinton was notified at least twice of its option, pursuant to the terms of the contract, to terminate the Agreement within 30 days of being notified of a rental increase and it chose not to exercise that option.

Because Global complied with the express terms of the contract and Hopkinton has not demonstrated otherwise, defendants' motion to dismiss the claim for breach of contract (Count III) will be allowed.

### 3.    Count IV: Breach of the Implied Covenant of Good Faith and Fair Dealing

"Under Massachusetts law, a covenant of good faith and fair dealing is implied in every contract." Shaulis v. Nordstrom, Inc., 120 F. Supp. 3d 40, 54 (D. Mass. 2015) (citing Uno Rests., 805 N.E.2d at 964).  The covenant provides that the parties will

> deal honestly and in good faith in both the
> performance and enforcement of the terms of their
> contract.

Id. (quoting Hawthorne's, Inc. v. Warrenton Realty, Inc., 606

N.E.2d 908, 914 (Mass. 1993)).  It is intended to

> guarantee that the parties remain faithful to the
> intended and agreed expectations of the parties in
> their performance.

Id. at 54-55 (quoting Uno Rests., 805 N.E.2d at 964); see also

A.L. Prime Energy Consultant, Inc. v. Mass. Bay Transp. Auth.,

95 N.E.3d 547, 560 (Mass. 2018) ("The covenant of good faith and

fair dealing . . . provides that neither party shall do anything

which will have the effect of destroying or injuring the right

of the other party to receive the fruits of the contract . . .

[and] [a] breach occurs when one party violates the reasonable

expectations of the other." (first and second alterations in

original) (internal quotation marks and citations omitted)

(quoting Weiler v. PortfolioScope, Inc., 12 N.E.3d 354, 361-62

(Mass. 2014))).  The plaintiff need not prove that there was bad

faith but rather must only prove a lack of good faith which can

be inferred from the totality of the circumstances. A.L. Prime,

95 N.E.3d at 560.

A party may enforce the implied covenant of good faith and

fair dealing even where no express term of the contract has been

breached. Shaulis, 120 F. Supp. 3d at 55 ("The essential inquiry

is whether the challenged conduct conformed to the parties'

-15-

reasonable understanding of the performance obligations, as reflected in the overall spirit of the bargain, not whether the defendant abided by the letter of the contract in the course of performance." (quoting Speakman v. Allmerica Fin. Life Ins., 367 F. Supp. 2d 122, 132 (D. Mass. 2005))).

Hopkinton alleges that Global was aware that the costs of the redevelopment project would be over $5 million when it sent plaintiff the January Letter but disingenuously suggested that those costs would merely be somewhere in excess of $500,000. Hopkinton submits that defendants deliberately underestimated the costs of the redevelopment to mislead it into renewing the franchise agreement.  Global purportedly knew that Hopkinton could not afford the rent associated with a $5 million redevelopment and thus used its discretionary right to redevelop the Premises as a pretext to coerce plaintiff into terminating the Agreement.  As a consequence, Global allegedly sought to misappropriate the goodwill of plaintiff's business and force Hopkinton to pay associated termination fees.

To the extent that Global was aware of the full extent of the redevelopment costs in January, 2018, but nevertheless failed to disclose those costs to Hopkinton in the January Letter, plaintiff has a plausible claim for breach of the implied covenant of good faith and fair dealing.  Such misconduct arguably violated the reasonable expectations of

-16-

Hopkinton which allegedly relied to its detriment on the representations in the January Letter.  Although Global may not have violated the express terms of the contract, it was required to act in good faith in negotiating the franchise renewal and not to withhold material information from Hopkinton.  Moreover, Global was not entitled to exercise its discretionary right to redevelop the Premises in a pretextual manner so as to gain an unfair advantage, such as by misappropriating Hopkinton's goodwill. See Anthony's Pier Four, Inc. v. HBC Assocs., 583 N.E.2d 806, 820 (Mass. 1991).  The allegation that defendants knew the full costs of the redevelopment in January, 2018, is supported by the fact that Global retained engineers and consultants during the preceding year to assess the redevelopment project.

Finally, plaintiff has sufficiently alleged harm from that alleged misconduct, namely: 1) the misappropriation of its goodwill, 2) the termination costs after redevelopment imposed by the Agreement, and 3) costs to be incurred for furnishing the new convenience store and to make up for profits lost during construction.

Accordingly, plaintiff has stated a plausible claim for breach of the implied covenant of good faith and fair dealing and defendants' motion to dismiss that claim (Count IV) will be denied.

-17-

### 4.   Count V: Chapter 93A

Section Two of Chapter 93A prohibits the use of unfair or deceptive business practices and Section 11 includes a private cause of action that enables business entities to recover therefor. M.G.L. c. 93A §§ 2, 11.  In order to state a claim under Section 11, an entity must have "suffer[ed] [a] loss of money or property" caused by the unfair or deceptive act or practice or demonstrate that it may experience such a loss in the future. Id. at § 11.

When determining whether an act or practice is unfair under Chapter 93A, a court assesses

> (1) whether the practice . . . is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers (or competitors or other business[people]).

City of Beverly v. Bass River Golf Mgmt., Inc., 93 N.E.3d 852, 863 (Mass. App. Ct. 2018) (alterations in original) (quoting PMP Assocs., Inc. v. Globe Newspaper Co., 321 N.E.2d 915 (Mass. 1975)).

> Practices may be deemed deceptive where they could reasonably be found to have caused a person to act differently from the way he otherwise would have acted . . . [or] when [the conduct] tends to mislead.

Id. (internal quotation marks and citation omitted).

> [A] mere breach of contract, without more, does not amount to a violation of G.L. c. 93A . . . [but rather] [c]ourts must consider whether the nature,

purpose, and effect of the challenged conduct is
coercive or extortionate.

Id. (internal quotation marks and citations omitted); see also
Skehel v. DePaulis, Civil Action No. 13-cv-11202-ADB, 2017 WL
2380164, at *3 (D. Mass. June 1, 2017) ("To be actionable, the
challenged misconduct must rise to the level of an extreme or
egregious business wrong, commercial extortion, or similar level
of rascality that raises an eyebrow of someone inured to the
rough and tumble of the world of commerce." (internal quotation
marks omitted)); Madan v. Royal Indem. Co., 532 N.E.2d 1214,
1217 (Mass. App. Ct. 1989); Levings v. Forbes & Wallace, Inc.,
396 N.E.2d 149, 153 (Mass. App. Ct. 1979) (Kass, J.).

     For the same reasons that plaintiff has stated a plausible
claim for breach of the implied covenant of good faith and fair
dealing, it has also stated a plausible claim for unfair and
deceptive practices under Chapter 93A.  Hopkinton asserts that
it never would have entered the Agreement had it known of the
five-fold rent increase which is precisely why Global did not
disclose the full cost of the redevelopment project in the
January Letter.  Rather, defendants allegedly sought to mislead
plaintiff into believing the cost of the redevelopment would be
closer to $500,000 to induce the renewal and ultimately coerce
plaintiff into terminating the franchise (thereby gaining
Hopkinton's goodwill and other associated benefits).  The

purported deceptive and extortionate nature of Global's alleged misconduct, if proven, supports a claim under Chapter 93A.

Plaintiff has therefore stated a plausible claim for unfair and deceptive practices pursuant to Chapter 93A and defendants' motion to dismiss that claim (Count V) will be denied.

### 5.   Count VI: Fraud in the Inducement

To prevail on a claim for fraud under Massachusetts law, the plaintiff must prove that

> (1) the defendant made a misrepresentation of fact; (2) it was made with the intention to induce another to act upon it; (3) it was made with knowledge of its untruth; (4) it was intended that it be acted upon[] and . . . was in fact acted upon; and (5) damages directly resulted therefrom.

Smith v. Zipcar, Inc., 125 F. Supp. 3d 340, 344 (D. Mass. 2015) (quoting Equip. & Sys. For Indus., Inc. v. Northmeadows Constr. Co., Inc., 798 N.E.2d 571, 574 (Mass. App. Ct. 2003)).  The plaintiff's reliance on the misrepresentation must have been reasonable. Masingill v. EMC Corp., 870 N.E.2d 81, 88 (Mass. 2007).

> Where there has been no affirmative misrepresentation,
> an action for fraud requires both concealment of material information and a duty requiring disclosure.

Id. (internal quotation marks omitted) (quoting Sahin v. Sahin, 758 N.E.2d 132, 138 n.9 (Mass. 2001)).  It is well-settled law in Massachusetts that there is no liability for bare nondisclosure. Id. (citing Swinton v. Whitinsville Sav. Bank, 42

N.E.2d 808, 809 (1942)).  Massachusetts courts have, however, held that a partially truthful or ambiguous statement may be an actionable falsehood where full disclosure is necessary to make the statement not misleading or where the nondisclosed fact goes to the essence of the transaction. Id. at 345-46 (collecting cases); see also Kannavos v. Annio, 247 N.E.2d 708, 711-12 (Mass. 1969) ("Fragmentary information may be as misleading as active misrepresentation, and half-truths may be as actionable as whole lies."); Stolzoff v. Waste Sys. Int'l, Inc., 792 N.E.2d 1031, 1044 (Mass. App. Ct. 2003).

Plaintiff has also stated a plausible claim for fraud in the inducement.  While Global's representation in the January Letter (that the costs of the redevelopment would exceed $500,000), was literally true, it was nevertheless misleading if Global knew at that time that the costs would actually exceed $5 million.  That withholding of information, if proven, constitutes fraud in the inducement.

Furthermore, plaintiff has alleged that defendants knowingly and intentionally withheld information in order to induce it to renew the franchise because they knew Hopkinton could not afford the five-fold rent increase.  Plaintiff contends that it would not have renewed the franchise had it known the full extent of the redevelopment and thus relied on the representations in the January Letter in entering the

Agreement.  Finally, as already explained, plaintiff has sufficiently pled that it has or will suffer damages as a result of the alleged fraudulent misconduct.

Defendants' motion to dismiss the claim for fraud in the inducement (Count VI) will thus be denied.

### ORDER

For the forgoing reasons, defendants' motion to dismiss (Docket No. 59) is

1) with respect to the claims for violation of the PMPA (Counts I and II) and the claim for breach of contract (Count III), **ALLOWED;** but is

2) with respect to the claim for breach of the implied covenant of good faith and fair dealing (Count IV), the claim for unfair and deceptive practices under Chapter 93A (Count V) and the claim for fraud in the inducement (Count VI), **DENIED.**


**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated June 4, 2019