### United States District Court
### District of Massachusetts

|  |  |  |
|---|---|---|
| Hopkinton Friendly Service, Inc., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 18-11977-NMG |
| Global Companies LLC and Global Montello Group Corp., | ) ) ) | |
| Defendants. | ) ) | |

### MEMORANDUM & ORDER

**GORTON, J.**

This case arises out of a franchise dispute between Hopkinton Friendly Service, Inc. ("Hopkinton" or "plaintiff") and Global Companies LLC and Global Montello Group Corp. (collectively "Global" or "defendants") after the franchisor, Global, increased the monthly rent of the franchisee, Hopkinton, in connection with a renovation of the leased property. Hopkinton filed this action against Global alleging federal and state law claims, three of which this Court dismissed in June, 2019.

Global now moves for summary judgment on Hopkinton's remaining claims, which include breach of the implied covenant of good faith and fair dealing and unfair and deceptive practices pursuant to Mass. Gen. L. c. 93A. For the reasons

- 1 -

that follow, defendants' motion for summary judgment will be
allowed.

I.  **Facts**

The Court set forth the factual background of this case in
greater detail in the Court's prior Memorandum and Order but
focuses on facts relevant to the pending motion here. (see
Docket No. 79).  Hopkinton is a family-operated business that
leases a gasoline station and convenience store in Hopkinton,
Massachusetts ("the Premises") from Global pursuant to a
franchise agreement.

Hopkinton entered into a three-year franchise agreement
with Global in or about 2012, in which Hopkinton was required to
pay a monthly rent of $8,730 with scheduled annual increases.
In 2015, the parties extended the agreement for an additional
three years at a monthly rent of $11,450, again with scheduled
increases thereafter.  During that time, Hopkinton operated its
business at a monthly profit of between $15,000 and $20,000.

In early 2017, Global retained attorneys, consultants and
engineers to explore the potential redevelopment and expansion
of the Premises.  As of August, 2017, Global had purchased two
parcels abutting the Premises and had begun finalizing its plans
for redevelopment.  Management met with Hopkinton's sole
principal, Nayla Aoude, in October, 2017 to advise her of

Global's redevelopment plans and that there would be public hearings held by the Town of Hopkinton to discuss those plans.

In December, 2017, Hopkinton received from Global a franchise renewal agreement ("Renewal Agreement") for an additional three years at a monthly rent of $14,138 with scheduled annual increases based on Rent Guidelines, which are expressly incorporated into the Renewal Agreement and apparently apply to all of Global's franchisees.  Hopkinton was given three months to accept or reject the Renewal Agreement and it had sent the Agreement to an attorney to be reviewed.

The Renewal Agreement provides Global the discretionary right to redevelop the Premises at any time, in any way, including reconstructing and/or adding buildings.  Under the Agreement, if Global exercises that right, it is required to reduce Hopkinton's rent during the period of demolition/ construction, but is allowed to increase the rent pursuant to the Rent Guidelines upon the completion of the redevelopment project.  Neither document discloses Global's planned capital investment for the project, but the Rent Guidelines explain clearly that,

> [i]f the cost of the redevelopment is equal to or greater than $500,000, the current annual rent will be increased by an amount equal to the total cost of the redevelopment multiplied by 15%.

Under section 7.5(b) of the Agreement, Hopkinton has a reciprocal right to terminate the franchise agreement without penalty or cost within 30 days of receiving notice of any redevelopment-related rental increase.

In early January, 2018, Global submitted an application to the Town for special permits and variances for redevelopment of the Premises.  On January 30, 2018, Global notified Hopkinton in writing of its purported plans for redevelopment but did not enclose a copy of Global's application to the Town ("the January Letter").  The letter explained that, if Global chose to proceed with the redevelopment project, it would, <u>inter</u> <u>alia</u>, acquire adjacent property and construct a larger store.  The letter also cautioned Hopkinton that any redevelopment would take place during the renewal term of Hopkinton's franchise and would result in an increase in rent.

The January Letter also referred Hopkinton to the portion of the Rent Guidelines used to calculate the associated rental increase based upon the total capital expenditure of the project.  Although the letter did not disclose the anticipated cost of the project, it confirmed that the cost would be more than $500,000, causing an associated rental increase of 15% of the total cost of the project.  Finally, the letter reminded Hopkinton of its right to terminate the franchise agreement

- 4 -

within 30 days of being notified of any redevelopment-related
rental increase and invited Hopkinton to contact Global with any
questions.  Ms. Aoude did not inquire into the anticipated cost
of the project.

In the following months, representatives from Global
continued to meet with Ms. Aoude to discuss the project, share
with her the site development plans and inform her of upcoming
public hearings held to discuss the project.  Ms. Aoude attended
only one of those hearings.  She signed the Renewal Agreement on
behalf of Hopkinton on March 16, 2018, after which she was
informed by Global about the approvals of the Town and the
acquisition of adjacent land needed for the redevelopment which
was completed in September, 2018.

On August 21, 2018, Hopkinton received a notice from Global
confirming the redevelopment of the Premises and advising it
that construction would begin in the fall of 2018.  That notice
also informed Hopkinton, for the first time, that the total cost
of the project would be in excess of $5 million, resulting in a
monthly rental increase of approximately $65,000 per month, to
commence upon completion of the redevelopment.  The notice again
reminded Hopkinton of its right to terminate the Agreement
within 30 days of the receipt of that notice.  Hopkinton did not
submit a notice of termination before September 20, 2018, it

continues to operate the franchise on the Premises and its rent has not yet been increased because the redevelopment project is incomplete.

Hopkinton submits that between 2012 and 2017, it never accrued an annual net profit of more than $70,000 and thus is unable to afford the dramatically increased monthly rental under the Agreement.  Ms. Aoude testified in a deposition in July, 2019, however, that she nonetheless would have signed the renewal agreement had she known of the cost of the proposed redevelopment and the associated rental increase.  She said specifically that,

> I can tell you that if they had presented me with that
> rent, I would have still signed it . . .

## II.  __Procedural History__

In September, 2018, Hopkinton filed a motion for a preliminary injunction under § 2805(b) of the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801 et seq., which the Court denied after a hearing.  In December, 2018, Hopkinton filed an amended complaint as to which Global filed a timely motion to dismiss for failure to state a claim.  In June, 2019, the Court allowed the motion, in part, and denied it, in part, dismissing Hopkinton's claims for violations of the PMPA and for breach of contract.

About six months later, defendants filed this motion for
summary judgment.  While the motion was pending, the parties
prepared for trial, which was set for March 9, 2020 but later
postponed until April.  The parties filed multiple pre-trial
motions, including motion to strike affidavit of undisclosed
expert (Docket No. 148), motion in limine to allow the use of
documents designated as confidential at trial (Docket No. 157),
motion in limine to exclude evidence of plaintiff's alleged
damages (Docket No. 158), motion in limine to preclude expert
witness testimony (Docket No. 160), motion for jury trial
(Docket No. 162) and motion to seal (Docket No. 169).  As a
result of the COVID-19 pandemic, however, the trial was
indefinitely postponed.

## III. **Defendants' Motion for Summary Judgment**

### A.  Legal Standard

The role of summary judgment is "to pierce the pleadings
and to assess the proof in order to see whether there is a
genuine need for trial." Mesnick v. Gen. Elec. Co., 950 F.2d
816, 822 (1st Cir. 1991) (quoting Garside v. Osco Drug, Inc.,
895 F.2d 46, 50 (1st Cir. 1990)).  The burden is on the moving
party to show, through the pleadings, discovery and affidavits,
"that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A fact is material if it "might affect the outcome of the suit under the governing law . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." Id.

If the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine, triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The Court must view the entire record in the light most favorable to the non-moving party and make all reasonable inferences in that party's favor. O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993).  Summary judgment is appropriate if, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Celotex Corp., 477 U.S. at 322-23.

**B. Arguments of the Parties**

Global contends that summary judgment is warranted in this case because the record establishes that it indisputably has acted fairly and in good faith in all dealings with Hopkinton

and has kept Hopkinton reasonably apprised of its redevelopment
plans during the negotiations of the Renewal Agreement and after
it became enforceable.  It submits that Global could not have
breached the implied covenant of good faith and fair dealing
because it complied reasonably with the literal terms of the
Renewal Agreement which permits Global both to redevelop the
Premises and to increase the rent after its completion based
upon the redevelopment costs.  Furthermore, it avers that the
contractual relationship of the parties has remained intact,
defeating any claim that the redevelopment project was
pretextual and designed to coerce Hopkinton into terminating the
lease and franchise.

Global also denies that there is any evidence that it has
violated Chapter 93A because it has shown that it engaged in a
series of good faith actions to keep Hopkinton informed of the
redevelopment plans, including showing and discussing with
Hopkinton representatives the redevelopment plans and providing
notice of the dates of public hearings that were held by the
Town as it considered the redevelopment project.  Finally,
Global argues that no reasonable jury could find that it
fraudulently induced Hopkinton into renewing the Agreement
because, as Hopkinton's sole principal Nayla Aoude testified,

she would have signed the Agreement even if Global had disclosed the full cost of the project and the resulting rental increase.

Hopkinton rejoins that the record establishes that Global violated the covenant of good faith and fair dealing and Chapter 93A by exercising its discretionary right to redevelop the Premises pretextually, having no legitimate good faith business purpose in its selection of and investment in the redevelopment project. Hopkinton contends that Global selected the Premises for redevelopment because of its "killer location" and the good will that Hopkinton had generated over the years. It asserts that Global then designed the redevelopment project for the sole purpose of coercing Hopkinton into renewing but then having to terminate its lease and franchise because of the dramatic rental increase and without any concern as to whether Hopkinton would be able to generate sufficient revenue to afford it. Although Hopkinton does not dispute that Global had a discretionary right to redevelop the Premises, it asserts that it had a right to expect that any cost associated with the redevelopment would not put it out of business.

Hopkinton further responds that Global knew of but intentionally concealed the actual scope and cost of the project, thereby fraudulently inducing Hopkinton to sign the Renewal Agreement. It submits that during the negotiations for

the Agreement, and particularly with respect to the January
Letter, Global represented only that the cost of the project
would be above $500,000, the amount listed in the uniform Rent
Guidelines above which a 15% figure is used to calculate future
rent payable.  Hopkinton asserts that when Global made that
representation, it did not disclose that Global had already
purchased adjacent land or that the realistic cost of the
project would be approximately $5 million.  Hopkinton does not,
however, refute Ms. Aoude's testimony that,

> I can tell you that if [Global] had presented me with
> that [increased] rent, I would have still signed [the
> Renewal Agreement] . . .

### C. Analysis

#### 1. Breach of the Implied Covenant of Good Faith and Fair Dealing

Massachusetts law provides that a covenant of good faith
and fair dealing is implied in every contract. Shaulis v.
Nordstrom, Inc., 120 F. Supp. 3d 40, 54 (D. Mass. 2015) (citing
Uno Rests. Inc. v. Boston Kenmore Realty Corp., 805 N.E.2d 957,
964 (Mass. 2004)).  The covenant provides that the parties will

> deal honestly and in good faith in both the
> performance and enforcement of the terms of their
> contract . . . [and] remain faithful to the [parties']
> intended and agreed expectations.

Id. at 54–55 (internal quotation marks and citations omitted).

Although the covenant protects the parties' expectations of the contract, it does not create rights or duties beyond the four corners of the contract. Famm Steel, Inc. v. Sovereign Bank, 571 F.3d 93, 100 (1st Cir. 2009) (quoting Chokel v. Genzyme Corp., 867 N.E.2d 325, 329 (Mass. 2007)).  It also applies only to conduct relating to the parties' performance of the contract, not to prior negotiations or conduct. AccuSoft Corp. v. Palo, 237 F.3d 31, 45 (1st Cir. 2001).

None of the laundry list of allegations against Global supports Hopkinton's burden of showing that Global was unfaithful to the parties' reasonable expectations.  Rather, the undisputed evidence suggests that Global, having pursued an opportunity to renovate and expand the Premises which it owned, exercised its contractual rights to redevelop the Premises and subsequently increase Hopkinton's rent based upon the cost of the redevelopment.  This Court does not find that Global exercised those rights in bad faith simply because it considered the location and customer base of Hopkinton in deciding to undertake an expensive redevelopment project on the Premises. Most franchisors making a similar decision to commit significant capital to redevelop a property want a "killer location" with a good customer base.  Furthermore, Global's decision to redevelop

was made before Hopkinton executed the operative Renewal Agreement and thus was not part of any implied covenant.

Further, as set forth above, before exercising its discretionary right to redevelop the Premises, Global indisputably engaged in a series of good faith actions to keep Hopkinton apprised of the redevelopment plans and direct the reasonable expectations of the parties. By the time Hopkinton signed the Agreement, it had been put on notice that Global was seriously considering a major redevelopment project that included acquiring adjacent land and expanding the current store which would obviously result in a substantial increase in rent.

Global did not obfuscate its intention after the Renewal Agreement became operative. In or around August, 2018, Global delivered a notice to Hopkinton 1) confirming the redevelopment of the Premises, 2) informing Hopkinton for the first time of the total cost of the project ($5 million), 3) notifying it of the monthly rental increase that would be imposed at the completion of the project pursuant to the Rent Guidelines ($65,000) and 4) reminding Hopkinton of its right to terminate the lease within 30 days of that notice. Before that time, Hopkinton had neither asked Global about the anticipated cost of the project nor had a representative attend more than one public hearing about it. Hopkinton did not send a termination notice

within 30 days of receiving the letter and the record suggests that it still operates the franchise on the Premises.

Having considered the terms of the operative contract and the series of good faith actions Global took to apprise Hopkinton of the redevelopment project before Hopkinton signed the contract, the Court is convinced that no reasonable jury could find Global breached the covenant of good faith and fair dealing because Global's actions were entirely consistent with the bargained-for terms of the Renewal Agreement and the expectations surrounding them.

Furthermore, Hopkinton has failed to present any evidence that Global's actions were motivated by a desire to deprive Hopkinton of its reasonable expectations of either 1) remaining on the Premises after redevelopment, continuing to operate the franchise and paying the increased rent or 2) unilaterally rejecting the increased rent by terminating the agreement. Although Hopkinton may have second thoughts about the contract it entered into, it cannot invoke the covenant of good faith and fair dealing to obtain rights for which it did not contract. Uno Rests., Inc., 805 N.E.2d at 964 ("The covenant may not . . . be invoked to create rights and duties not otherwise provided for in the existing contractual relationship."). Because the Renewal Agreement does not provide for any such rights and the

record does not show that Hopkinton could reasonably have
expected otherwise, the Court will grant summary judgment for
Global on this claim.

### 2. Chapter 93A

Section Two of Chapter 93A prohibits the use of unfair or
deceptive business practices and Section 11 includes a private
cause of action that enables business entities to recover
therefor. M.G.L. c. 93A §§ 2, 11.  In order to state a claim
under Section 11, an entity must have "suffer[ed] [a] loss of
money or property" caused by the unfair or deceptive act or
practice or demonstrate that it may experience such a loss in
the future. Id. at § 11.

When determining whether an act or practice is unfair under
Chapter 93A, a court assesses

> (1) whether the practice . . . is within at least the
> penumbra of some common-law, statutory, or other
> established concept of unfairness; (2) whether it is
> immoral, unethical, oppressive, or unscrupulous; [and]
> (3) whether it causes substantial injury to consumers
> (or competitors or other business[people]).

City of Beverly v. Bass River Golf Mgmt., Inc., 93 N.E.3d 852,
863 (Mass. App. Ct. 2018) (alterations in original) (quoting PMP
Assocs., Inc. v. Globe Newspaper Co., 321 N.E.2d 915 (Mass.
1975)); see also Skehel v. DePaulis, Civil Action No. 13-cv-
11202-ADB, 2017 WL 2380164, at *3 (D. Mass. June 1, 2017) ("To
be actionable, the challenged misconduct must rise to the level

of an extreme or egregious business wrong, commercial extortion, or similar level of rascality that raises an eyebrow of someone inured to the rough and tumble of the world of commerce." (internal quotation marks omitted)); Madan v. Royal Indem. Co., 532 N.E.2d 1214, 1217–18 (Mass. App. Ct. 1989); Levings v. Forbes & Wallace, Inc., 396 N.E.2d 149, 153 (Mass. App. Ct. 1979) (Kass, J.).

For the same reason that Hopkinton has failed to raise a genuine issue of material fact relating to its claim for breach of the implied covenant of good faith and fair dealing, it has failed to support its claim for unfair and deceptive practices under Chapter 93A.  Global has established, and Hopkinton has not refuted, that it engaged in a series of good faith actions to keep Hopkinton apprised of its redevelopment plans both before Hopkinton renewed the franchise agreement and after the renewal became operative, thereby negating any claim that Global's conduct was either unfair or deceptive.

### 3. Fraud in the Inducement

To prevail on a claim for fraud under Massachusetts law, the plaintiff must prove that

> (1) the defendant made a misrepresentation of fact;
> (2) it was made with the intention to induce another
> to act upon it; (3) it was made with knowledge of its
> untruth; (4) it was intended that it be acted upon[]
> and . . . was in fact acted upon; and (5) damages
> directly resulted therefrom.

<u>Smith</u> v. <u>Zipcar, Inc.</u>, 125 F. Supp. 3d 340, 344 (D. Mass. 2015)
(quoting <u>Equip. & Sys. For Indus., Inc.</u> v. <u>Northmeadows Constr.
Co., Inc.</u>, 798 N.E.2d 571, 574 (Mass. App. Ct. 2003)).   The
plaintiff's reliance on the misrepresentation must have been
reasonable. <u>Masingill</u> v. <u>EMC Corp.</u>, 870 N.E.2d 81, 88 (Mass.
2007).

> Where there has been no affirmative misrepresentation,
> an action for fraud requires both concealment of
> material information and a duty requiring disclosure.

<u>Id.</u> (internal quotation marks omitted) (quoting <u>Sahin</u> v. <u>Sahin</u>,
758 N.E.2d 132, 138 n.9 (Mass. 2001)).   It is well-settled law
in Massachusetts that there is no liability for bare
nondisclosure. <u>Id.</u> (citing <u>Swinton</u> v. <u>Whitinsville Sav. Bank</u>, 42
N.E.2d 808, 809 (1942)).   Massachusetts courts have, however,
held that a partially truthful or ambiguous statement may be an
actionable falsehood where full disclosure is necessary to make
the statement not misleading or where the nondisclosed fact goes
to the essence of the transaction. <u>Id.</u> at 345-46 (collecting
cases).

      Regardless of whether Global made any misrepresentation
during the negotiation of the Renewal Agreement concerning the
anticipated capital investment in the redevelopment project and
related rental increase, the Court finds that no reasonable jury
could find Hopkinton was fraudulently induced into signing the

Agreement because Hopkinton's sole principal, Ms. Aoude,
admitted that she did not act upon any representation of Global
in deciding to sign it.

Her statement shows indisputably that any purported
concealment of the true cost and scope of the redevelopment and
related rental increase did not induce Hopkinton to sign the
Agreement because Ms. Aoude would have signed the Agreement in
any event.  Accordingly, because there is no genuine dispute of
material fact as to whether Hopkinton acted upon a
representation of Global, misleading or otherwise, when it
decided to renew the Agreement, Hopkinton cannot avoid summary
judgment on this count.

### ORDER

For the foregoing reasons,

1) the motion of defendants Global Companies LLC and Global
   Montello Group Corp. for summary judgment (Docket No.
   127) is **ALLOWED**;

2) all other pending motions are hereby **DENIED** as moot.

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated September 29, 2020

- 18 -